NOT FOR PUBLICATION

RECEIVED
APR 2 6 2018
AT 8:30_____M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JEAN CHARTE, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN TUTOR, INC., JAMES WEGELER, JR., JAMES WEGELER, SR., and SEAN WEGELER, <br><br> Defendants. | Civ. No. 10-3318 <br><br> OPINION |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court on a motion for summary judgment brought by Defendants American Tutor, Inc., James Wegeler, Jim Wegeler, and Sean Wegeler ("Defendants").[1] (ECF No. 45.) Plaintiff-Relator Jean Charte ("Ms. Charte") opposes (ECF No. 47), and Plaintiff the United States does not oppose (ECF No. 51). The Court has decided the Motion after considering the parties' written submissions without oral argument pursuant to Local Civil Rule 78.1(b). For the following reasons, Defendants' Motion is denied.

## BACKGROUND

Ms. Charte's claims as *qui tam* relator stem from allegations that she is entitled to recover damages and civil penalties on behalf of the United States for Defendants' violations of the False Claims Act ("FCA"). (*See* Am. Compl. ¶ 1, ECF No. 3.) From July 2005 until September 2007,

---

[1] The names of these defendants were inaccurately pled, as reflected in the case caption. (*See* Wegeler Decl. ¶ 2, ECF No. 45-1.) And, though filed on the docket as a motion to dismiss, the parties have briefed this matter as a motion for summary judgment.

1

Ms. Charte was employed by Defendant American Tutor, a supplemental education services company owned by James Wegeler and employing Jim and Sean Wegeler. (*Id.* ¶¶ 6–10; Defs.' Statement of Undisputed Material Facts ("SMF") ¶ 1, ECF No. 45-2.) Beginning in May 2007, Ms. Charte expressed concerns to American Tutor that its billing practices and aggressive recruitment efforts to increase student enrollment violated state and federal law. (Am. Compl. ¶¶ 28–38, 42; Defs.' SMF ¶ 2.) After reporting her concerns to management, Ms. Charte was fired by American Tutor on September 5, 2007. (Am. Compl. ¶ 46; Defs.' SMF ¶ 2.) Ms. Charte made inquiries to determine whether the practices she had observed indeed violated the law, and then reported Defendants' alleged wrongdoing to investigators at the New Jersey and U.S. Departments of Education. (Am. Compl. ¶¶ 43–44, 49–54.)

In October 2008, American Tutor, Jim Wegeler, and James M. Wegeler filed a civil action against Ms. Charte in the Superior Court of New Jersey, Somerset County, Law Division, alleging defamation, tortious interference with advantageous economic relations, and product disparagement due to her reports. (Defs.' SMF ¶ 3.) Ms. Charte answered in January 2009, filing counterclaims for defamation, tortious interference with advantageous economic relations, and wrongful discharge. (*Id.* ¶ 4.) In June 2010, Ms. Charte filed her present federal *qui tam* Complaint under seal, against the same parties plus Sean Wegeler, alleging that Defendants had submitted false claims for reimbursement to the U.S. Department of Education and State of New Jersey. (*Id.* ¶¶ 6–7.) Because it was filed under seal, as required by statute, Defendants were not served or otherwise notified of this Complaint at that time.

On November 16, 2010, the Government filed an application to stay and administratively terminate the *qui tam* action. (ECF No. 5.) On November 17, 2010, the Court entered an Order staying and administratively terminating the *qui tam* case. (ECF No. 6.) On January 20, 2012,

Ms. Charte filed a motion to lift the stay and consolidate the state court defamation action and the federal *qui tam* action or, in the alternative, to bar application of preclusion doctrines including *res judicata*, collateral estoppel, and New Jersey's entire controversy doctrine in the federal case (ECF No. 7). (Defs.' SMF ¶ 13.) The Government opposed that motion on February 10, 2012 (ECF No. 8). (Defs.' SMF ¶ 14.) Before the motion was decided, however, Ms. Charte entered into a Settlement Agreement with American Tutor and Jim and James Wegeler on July 2, 2012, settling the claims in the state court action. (*Id.* ¶ 15; Op. at 3, ECF No. 10.) The Settlement Agreement included mutually agreed-upon terms regarding confidentiality, non-disparagement, enforcement of the agreement, and potential future claims.[2] (Defs.' SMF ¶ 15.)

On August 3, 2012, this Court denied Ms. Charte's motion to lift the stay and consolidate the federal and state cases. (ECF Nos. 10, 11.) In that Opinion, the Court noted that Ms. Charte sought to consolidate the *qui tam* case and the state case because the state case "involves the same facts and substantially the same issues." (Op. at 1, ECF No. 10.) On August 8, 2012, the New Jersey Superior Court entered a Consent Order of Dismissal in the state defamation action. (Defs.' SMF ¶ 18.) Defendants represent that at the time the Settlement Agreement was signed and the Consent Order of Dismissal entered in state court, they were unaware of the pending federal *qui tam* action. (*Id.* ¶ 20.) Defendants first learned of the existence of the *qui tam* action in December 2013, and that Ms. Charte was the relator once the Complaint was unsealed and served upon Defendants in October 2017. (*Id.* ¶¶ 21–22.)

Ultimately, the Government declined to pursue any criminal prosecution based on the allegations of fraudulent billing outlined in the *qui tam* Complaint. (*Id.* ¶ 25.) However, in June 2016, the Government brought criminal charges against Jim Wegeler for tax fraud and tax

---

[2] Ms. Charte emphasizes that the *qui tam* Complaint had already been filed at the time she signed the state defamation action Settlement Agreement. (Pl.'s Suppl. SMF ¶ 7, ECF No. 47-1.)

3

evasion, with all subsequent proceedings before this Court (*see* Crim. No. 16-273).[3] (Defs.' SMF ¶ 26.) The civil *qui tam* case remained stayed pending disposition of the Government's criminal investigation and prosecution.

In June 2016, Jim Wegeler pled guilty to one count each of tax evasion and tax fraud. (Defs.' SMF ¶ 27.) In June 2017, this Court sentenced Jim Wegeler to 19 months imprisonment on each count to be served concurrently, a three-year term of supervisory release with special conditions, and restitution in the amount of $1,494,521. (Crim. No. 16-273, ECF Nos. 29, 30.) Prior to his sentencing, Jim Wegeler had made full restitution, paying $2,010,550 to the United States Treasury—his total tax liability, plus interest and penalties. (Defs.' SMF ¶ 35.) Ms. Charte asserts that his criminal prosecution and conviction are the result of her reports and can fairly be attributed to her role as relator. (*Id.* ¶ 30.)

On August 28, 2017, Ms. Charte filed a motion in the *qui tam* action to reopen the case, compel the Government to make a determination about intervening, and lift the seal and stay. (ECF No. 32.) After conducting an extensive investigation regarding Ms. Charte's allegations of fraud, the Government declined to intervene in the instant *qui tam* action, and on September 21, 2017, this Court reopened the case and directed certain docket entries to be unsealed and served upon Defendants. (*See* ECF No. 34 (Order docketed 10/06/2017); Defs.' SMF ¶¶ 36–37.)

On February 15, 2018, Defendants moved for summary judgment. (ECF No. 45.) Ms. Charte filed opposition on March 5, 2018. (ECF No. 47.) Defendants replied on March 12, 2018. Pursuant to the Court's September 21st Order, by letter the Court requested input and/or "written

---

[3] Ms. Charte sought to intervene in the criminal case for the limited purpose of claiming a relator's share of any assets or monies recovered through any payment of forfeiture or restitution pursuant to the False Claims Act (31 U.S.C. §§ 3729–3733). The Government opposed that motion, and the Court denied that motion on February 1, 2017. (Crim. No. 16-273, ECF Nos. 13, 16, 17.) Ms. Charte has appealed the orders denying her Motion to Intervene to the Third Circuit Court of Appeals. (Defs.' SMF ¶¶ 32–33.)

4

consent" from the Government regarding the pending Motion. (ECF No. 50.) On March 29, 2018, the Government responded that it did "not oppose the dismissal of the action should the Court determine that such dismissal is appropriate under the law, so long as such dismissal is without prejudice as to the United States." (ECF No. 51.) The Court now considers the Motion.

## **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002). In resolving a motion for summary judgment, a district court considers the facts drawn from "materials in the record," including depositions, documents, affidavits, and declarations. Fed. R. Civ. P. 56(c)(1)(A). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## **ANALYSIS**

Defendants ask this Court to enforce the confidentiality and non-disparagement provisions of the state court Settlement Agreement, and on that basis enter summary judgment in their favor. In the alternative, Defendants seek summary judgment on the basis of New Jersey's

entire controversy doctrine. The parties do not genuinely dispute the facts material to these arguments. The Court considers each argument in turn below.

I. Enforcement of the Settlement Agreement

Courts may enforce release provisions in settlement agreements executed between private parties prior to the filing of *qui tam* actions to dismiss later-filed *qui tam* actions.[4] *See, e.g.*, *Radcliffe*, 600 F.3d at 328 ("[T]he consent of the government is not a necessary condition precedent to enforcement of an otherwise valid release where such a release is executed prior to filing a *qui tam* action."). However, 31 U.S.C. § 3130(b)(1) prohibits a relator from unilaterally settling an FCA-related case after a *qui tam* lawsuit has been filed. *United States ex rel. Gohil v. Sanofi-Aventis U.S. Inc.*, 96 F. Supp. 3d 504, 515 (E.D. Pa. 2015) ("The critical issue becomes: when did relator sign the release—before or after filing the *qui tam* action?"). Where the "*qui tam* action pre-dates the . . . settlement agreement . . . , the release is of no effect in [the *qui tam*] litigation." *Id.* at 516; *see also United States ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 336 (D. Mass. 2011) ("A relator may not enter into an enforceable settlement or release of *qui tam* claims *after* filing a False Claims Act action.").

The cases Defendants cite in support of enforcing the confidentiality and non-disparagement provisions are inapposite here for two reasons: (1) they concern settlement

---

[4] Many Circuits apply a balancing test derived from *Town of Newton v. Rumery*, 480 U.S. 386 (1987), to determine the enforceability of the earlier-entered releases, analyzing "whether the interest in enforcement outweighs a public policy that would be harmed by enforcement." *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1169–70 (10th Cir. 2009); *see also, e.g.*, *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319, 329 (4th Cir. 2010); *United States ex rel. Gebert v. Transp. Admin. Servs.*, 260 F.3d 909, 916 (8th Cir. 2001); *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230, 233 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Mar. 19, 1997) ("[P]refiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim." (quoting *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995))).

6

agreements executed *before* the filing of the *qui tam* action, and (2) they focus on the enforcement of "release" provisions. In seeking to enforce the confidentiality and non-disparagement provisions of a post-filing settlement agreement, Defendants invite this Court to create a backdoor around the statutory requirement that the government consent to settlement of *qui tam* claims once they are filed.

The timeline here complicates Defendants' argument. Ms. Charte filed her *qui tam* Complaint in 2010. The Settlement Agreement was executed in July 2012, and the state court entered a Consent Order of Dismissal, without prejudice, in August 2012. Unlike the decisions on which Defendants rely, the *qui tam* action here was filed *before* Ms. Charte executed the Settlement Agreement. *Cf. Hall*, 104 F.3d at 233; *see also Gohil*, 96 F. Supp. 3d at 515–16 (collecting cases). The parties do not dispute that the Government was not a party to the 2012 Settlement Agreement and did not provide its written consent, which is a condition precedent to this Court enforcing a post-filing release, *see* 31 U.S.C. § 3130(b)(1). Assuming arguendo that the Settlement Agreement could bar Ms. Charte from pursuing her *qui tam* claim, it was only effective as of July 2012 and cannot retroactively bar Ms. Charte's 2010 *qui tam* filing.

Perhaps recognizing the chronological flaw in their argument, Defendants do not hang their hats on the "potential future claims" provision of their Settlement Agreement with Ms. Charte, which operated as a release of claims. Rather, Defendants ask the Court to enforce the confidentiality and non-disparagement provisions of the Settlement Agreement, which they suggest *presently* operate to foreclose Ms. Charte's continued participation in this litigation. In similar cases, courts have focused on the temporal relationship between (1) when the civil and *qui tam* actions were filed, (2) when the government obtained knowledge of the fraud, and (3) when the release was executed. *See, e.g., Hall*, 104 F.3d at 233 ("Our refusal to enforce the

release in *Green* turned on the public interest in learning about claims of government contractor fraud, and upon the fact that in that case, the government had not been aware of Green's allegations *at the time of the settlement release*." (emphasis added)). In contrast, Defendants ask this Court to focus on those first two sets of events in relation to the timing of *enforcement* of the settlement agreement, instead of when it was signed and became enforceable. (*See* Defs.' Br. at 3, ECF No. 45-4 (citing *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 481 F. Supp. 2d 815, 820 (S.D. Tex. 2007)); Defs.' Reply at 2–4, ECF No. 48.)[5]

The Court is not persuaded by the cases Defendants cite. Even in *Green*, the government had already learned of the fraud allegations at the time the Defendant sought enforcement of the release. Nevertheless, since the dispositive inquiry focused on the timing of the release itself, not its subsequent enforcement, the court declined to enforce the release. *See Green*, 59 F.3d at 966 ("To be sure, the concerns identified above are not as pressing on the facts of this case as they would be in many other contexts. The government now has learned of the allegations of fraud made by Green. . . . In light of the *ex ante* effects of enforcing the parties' agreement, we reject Appellees' contention that the policies of the FCA would not seriously be impaired by enforcing the Release."); *see also Longhi*, 481 F. Supp. 2d at 821 ("Defendants therefore have failed to demonstrate that the government had fully investigated the matter or even had full knowledge of the alleged fraud prior to the *execution of the release*, as is required under *Green/Hall*." (emphasis added)).

---

[5] Defendants' argument is internally inconsistent. Defendants assert that in knowingly and voluntarily agreeing to the confidentiality and non-disparagement provisions of the Settlement Agreement, Ms. Charte waived her right to prosecute or participate in the *qui tam* action, which necessarily would involve her disclosure of information barred by the confidentiality and non-disparagement provisions. (*See* Defs.' Br. at 7; *contra* Pl.'s Br. at 14, ECF No. 47.) But this keys the legal effect of those provisions to the time of execution, not the time of enforcement.

Even if the Court were to consider enforcing these provisions, they are extremely broad, covering "the disputes and differences between the Parties" and expressly prohibiting disclosure of the "contents or substance of[] the pleadings in the Litigation . . . [and] the existence, terms, or provisions" of the Settlement Agreement. (Defs.' Ex. C at 2, ECF No. 45-1.) Enforcing such a broad confidentiality provision that prevents someone from reporting fraud to the government is fundamentally inconsistent with the public policy goals of the FCA. *See Green*, 59 F.3d at 963 ("It is commonly recognized that the central purpose of the *qui tam* provisions of the FCA is to 'set up incentives to supplement government enforcement' of the Act, by 'encourag[ing] insiders privy to a fraud on the government to blow the whistle on the crime[.]'" (internal citations omitted)). Courts have been reticent to enforce pre-filing releases because of this same overarching concern, even though such releases only have a chilling effect on a relator's disclosure and do not expressly prohibit communication to the government. *Id.* at 965. However, enforcement of a confidentiality provision poses even greater threat to the public policy behind the FCA than enforcement of a release provision, because it squarely prevents disclosure of underlying fraudulent conduct, and thereby totally frustrates the purpose of the FCA.

Favorably citing the Ninth Circuit's decision in *Hall*, which distinguished *Green* on the basis that the government already had knowledge of the underlying allegations of fraud in *Hall* at the time the relator signed the release, *see* 104 F.3d at 233, Defendants encourage this Court to craft a rule narrowly tailored to the precise factual circumstances here. Defendants argue that the public policy behind the FCA is not hindered if a confidentiality provision is enforced after a relator has already provided all relevant information to the Government, the Government has declined to intervene in the *qui tam* action after a full investigation, and the Government does not oppose dismissal.

The Court cannot find, as a matter of law, that the provisions of the Settlement Agreement bar Ms. Charte's participation here. While the present posture of this case may mean that enforcement of any provision of the Settlement Agreement will, as a practical reality, have no impact on "the public interest in having information brought forward that the government could not otherwise obtain," *Hall*, 104 F.3d at 233, the Court is nevertheless reticent to apply this Settlement Agreement as a shield. The public policy implications of even a narrowly tailored holding are too great, especially when it operates as a workaround to express statutory language. *See United States ex rel. Bahrani v. ConAgra, Inc.*, 183 F. Supp. 2d 1272, 1278 (D. Colo. 2002) ("[T]he public's interest in providing incentives for [relator] to disclose fully to the government inside information concerning alleged government fraud was very much in place at the time [relator] executed the Release. That the government had some knowledge of the alleged fraud does not negate this interest."). Accordingly, the Court declines to find that the confidentiality and non-disparagement provisions of the 2012 Settlement Agreement bar Ms. Charte's participation in this *qui tam* litigation. Summary judgment is denied on that basis.

II. Preclusion Doctrines

Defendants next argue that the Entire Controversy doctrine bars Ms. Charte's continued participation in this *qui tam* action. Without having filed a notice of motion, as required by the Local Civil Rules, Ms. Charte purports to cross-move in her brief and asks this Court to bar application of any preclusion doctrines in this case, renewing her similar January 2012 motion (*see* ECF No. 7).[6] (Pl.'s Br. at 18–19.)

---

[6] Renewal was permitted by the Court's August 2012 Order (*see* ECF No. 11), but Ms. Charte overstates the effect of that Order, which did not "outline" any particular "relief" in her favor. (*See* Pl.'s Br. at 18, 19.) Ms. Charte has failed to follow the Local Civil Rules, as well as this Court's Order, which specified "that Charte may move to bar application of the Preclusion Doctrines after the stay is lifted in this action, upon a new notice of motion, and in accordance with both the Federal Rules of Civil Procedure and the Local Civil Rules[.]" (Order at 2, ECF

New Jersey's unique brand of *res judicata* is the Entire Controversy doctrine, "an extremely robust claim preclusion device that requires adversaries to join all possible claims stemming from an event or series of events in one suit." *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 135 (3d Cir. 1999); *see also Rycoline Prods., Inc.*, 109 F.3d at 886. In essence, the doctrine requires a party to bring all claims arising out of the same transaction or occurrence against all relevant parties or risk losing those claims forever in a subsequent action. *See, e.g., Rycoline Prods., Inc.*, 109 F.3d at 885; *DiTrolio v. Antiles*, 662 A.2d 494, 504 (N.J. 1995) ("[T]he determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts."). "The purposes of the doctrine are threefold: (1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." *DiTrolio*, 662 A.2d at 502. The doctrine is not to be applied in a "mechanistic" manner; "[r]ather, courts should carefully examine the interests of the parties, expenditure of judicial resources, and any procedural mechanisms available to achieve a just result." *J-M Mfg. Co. v. Phillips & Cohen, LLP*, 129 A.3d 342, 349 (N.J. Super. Ct. App. Div. 2015), *cert. denied* 135 A.3d 148 (Table) (N.J. 2016).

Preclusion doctrines such as New Jersey's entire controversy doctrine do not require dismissal when multiple actions are pending simultaneously. *See, e.g., Kaselaan & D'Angelo Assocs., Inc. v. Soffian*, 675 A.2d 705, 708 (N.J. Super. Ct. App. Div. 1996) ("[T]he entire controversy doctrine only precludes *successive* suits involving related claims. It does not require dismissal when multiple actions involving the same or related claims are pending simultaneously." (emphasis added) (citing *Mortgagelinq Corp. v. Commonwealth Land Title Ins.*

---

No. 11.) Though the Court considers her arguments in opposition to Defendants' Motion, it declines to construe this portion of her brief as its own cross-motion.

11

*Co.*, 662 A.2d 536, 539–40 (N.J. 1995))). Rather, a prior action bars related suits filed after the final judgment is entered. However, when overlapping lawsuits are pending simultaneously, New Jersey courts may utilize other procedural vehicles to streamline the litigation and promote judicial efficiency. *Kaselaan*, 675 A.2d at 709 (suggesting a state court can efficiently manage its docket when a related case is pending in federal court through a stay, dismissal pursuant to the first-filed doctrine, or restraining a litigant from prosecuting an action in a foreign jurisdiction).

Here, the Settlement Agreement and Order of Dismissal in the state defamation action were not executed and entered until roughly two years after this *qui tam* case was filed. Under a rigid application of the entire controversy concept, that 2012 outcome could not preclude this then-pending litigation filed in 2010.[7] However, "[t]he decision whether to apply the entire controversy doctrine is ultimately one of judicial fairness and will be invoked in that spirit. It is not an artificial bright line rule." *J-M Mfg. Co.*, 129 A.3d at 349 (internal citations and quotations omitted). Further, "[a]pplication of the rule . . . is discretionary and clarification of the limits of the doctrine is best left to case-by-case determination." *Rycoline Prods., Inc.*, 109 F.3d at 886 (quoting *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla*, 662 A.2d 509, 513 (N.J. 1995)).

Due to the rules of *qui tam* litigation, Ms. Charte filed her Complaint as relator under seal and without notice to Defendants. Accordingly, Defendants were not aware of this action until 2013 nor served until 2017—after the state case was settled and dismissed. Though technically pending in 2010, this *qui tam* case had no active litigation against these Defendants until 2017,

---

[7] This same rationale would apply with equal force to other preclusion doctrines, including claim preclusion (*res judicata*) and issue preclusion (collateral estoppel). All such doctrines find that preclusive effect attaches only after a final judgment on the merits or some equivalent result. *See, e.g.*, *Electro-Miniatures Corp. v. Wendon Co.*, 889 F.2d 41, 44 (3d Cir. 1989) ("Generally speaking, the principle of claim preclusion prevents a party from relitigating a claim that was the subject of a judgment in a prior action between the same parties.").

once the stay was lifted and the Defendants were served. Given the policy behind the entire controversy doctrine, its reach should extend to bar this case.

It is beyond dispute that the state case and this *qui tam* action arise out of the same series of events. *See, e.g., J-M Mfg. Co.*, 129 A.3d at 347 ("Both the qui tam action and this case arise out of [the qui tam defendant's] alleged fraud and [relator's] subsequent investigation."). Nevertheless, Ms. Charte argues that the agreement "was carefully negotiated" by her counsel and that the claims in the state action "were unrelated to the pending *qui tam* action[.]" (Pl.'s Br. at 14, ECF No. 47.)

Ms. Charte attempts to use the asymmetric information in her possession at the time of signing the settlement agreement to her own advantage in arguing against preclusive effect. Ms. Charte says she would not have signed the Settlement Agreement if she knew it would bar her already-filed *qui tam* action. But, by the same turn, Defendants also may not have signed the Settlement Agreement if they had known it would not protect them against this litigation, which from their perspective is akin to a future claim arising out of the same transaction or occurrence—which they sought to fully and finally settle. *See DiTrolio*, 662 A.2d at 508 ("It is unrealistic to suggest that the parties reached a final resolution of the whole controversy by a settlement that now confronts the judicial system with another full-blown lawsuit based on the very same transaction. At best what has been achieved is a partial settlement that fails by a very wide margin to bring litigational peace at once to all of the parties enmeshed in the same controversy."). Moreover, Ms. Charte's argument that their state settlement agreement limited the release of claims to those actually litigated in the state proceeding is immaterial; the entire controversy doctrine takes effect, by operation of law, because of the *fact* of prior settlement, not based on the substantive terms of settlement.

In sum, the Court takes note of the fairness principles underscoring the entire controversy doctrine. Here, the Government investigated Ms. Charte's claims and declined to intervene after seven years, and further, has not opposed Defendants' Motion. Yet Ms. Charte continues to engage in just the kind of litigation gamesmanship the entire controversy doctrine is designed to prevent. *See id.* at 506 ("Plaintiff already received the equitable relief he requested in the original suit when he was fully aware that he was targeting defendants for another action; he should not now be allowed to manipulate the judicial system to get the monetary damages he could have sought in the first action.").

Ms. Charte separately contends that settlement and dismissal "without prejudice" lack preclusive effect under the entire controversy doctrine. "Although a settlement or a dismissal without prejudice is a factor a court should consider when applying the entire controversy doctrine, neither is dispositive in the circumstances of this litigation." *DiTrolio*, 662 A.2d at 508. The entire controversy doctrine can operate on the basis of a mutually-entered settlement agreement in a state case arising out of the same transaction or occurrence and among substantially the same parties and others who could have been joined in the earlier litigation. The Court concludes it is fundamentally fair in these circumstances to apply the entire controversy doctrine to bar this suit and find summary judgment for Defendants.

## CONCLUSION

For the reasons stated herein, Defendants' Motion is granted. An appropriate order will follow.

Date: 4/26/18

ANNE E. THOMPSON, U.S.D.J.